# Exhibit A

---

# Second Amended Complaint

# STATE OF MICHIGAN
## OAKLAND COUNTY CIRCUIT COURT

LESLIE J. MURPHY and VINCENT J.
MARTIN, III, Individually and On Behalf of
All Others Similarly Situated,

                Plaintiffs,

   v.

SAMUEL M. INMAN, III, JOHN F. SMITH,
BERNARD M. GOLDSMITH, WILLIAM O.
GRABE, LAWRENCE DAVID HANSEN,
ANDREAS MAI, JONATHAN YARON, and
ENRICO DIGIROLAMO,

                Defendants.

Case No. 2017-159571-CB
Hon. Victoria A. Valentine

<u>CLASS ACTION</u>

SECOND AMENDED COMPLAINT
FOR BREACH OF FIDUCIARY DUTIES

Business Court Eligible, MCL
600.8031(1)(c)(iv)

Sara K. MacWilliams (P67805)
**MACWILLIAMS LAW PC**
*Attorney for Plaintiffs*
838 W. Long Lake Road, Suite 211
Bloomfield Hills, MI 48302
(248) 432-1586
sm@macwilliamslaw.com

Juan E. Monteverde (NY4467882)
Miles D. Schreiner (NY 5113956)
**MONTEVERDE & ASSOCIATES, PC**
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
jmonteverde@monteverdelaw.com
mschreiner@monteverdelaw.com
**(Admitted *Pro Hac Vice*)**

There is no pending or resolved civil action arising out of Defendant's breach of fiduciary duties required under Michigan state law and owed to shareholders in connection with the transaction or occurrence as is addressed herein.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

## SECOND AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND[1]

Leslie J. Murphy and Vincent J. Martin, III ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, alleges the following upon information and belief, including the investigation of counsel and a review of publicly-available information, except as to those allegations pertaining directly to Plaintiffs, which are alleged upon personal knowledge:

### SUMMARY OF THE ACTION

1.     Plaintiffs bring this shareholder class action on behalf of themselves and similarly situated former shareholders of Covisint Corporation ("Covisint" or the "Company") against the former members of Covisint's board of directors (collectively, the "Board"), Covisint's former President and Chief Executive Officer Samuel M. Inman, III ("Inman"), and its former Chief Financial Officer Enrico Digirolamo ("Digirolamo" and, collectively with Inman and the Board, the "Defendants"), for breaching their fiduciary duties in connection with the acquisition of all the outstanding stock of Covisint by Open Text Corporation ("OpenText").

2.     Covisint was a Michigan corporation that maintained its principal executive offices in Southfield, Michigan.  The Company provides a cloud engagement platform that assists organizations to connect and communicate with customers, business partners, and suppliers.  Its cloud platform has become the platform of choice for enabling Internet of Things and identity-centric solutions securely and at scale. Covisint supports more than 2,000 organizations and connects to more than 212,000 business partners and customers worldwide.

---

[1]   This Second Amended Complaint is substantively identical to the Amended Complaint file-stamped September 5, 2017. It has been changed solely to add Mr. Martin as a plaintiff and to conform Count I in a manner consistent with the Michigan Supreme Court's opinion in this action. *See Murphy vhh Inman*, 509 Mich 132, 983 NW2d 354 (2022).

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

3.      On June 5, 2017, Covisint announced that it had entered into a definitive Agreement and Plan of Merger ("Merger Agreement") pursuant to which OpenText would acquire all the outstanding shares of Covisint common stock and Covisint shareholders would receive $2.45 in cash (the "Merger Consideration") for each outstanding share of common stock they own (the "Merger").

4.      The Merger Consideration, the strategic review process Defendants conducted prior to approving the Merger Agreement, and the terms of the Merger Agreement were fundamentally unfair to Covisint's former public shareholders.   The $2.45 per share Merger Consideration represented a meager 2% premium compared to the Company's 52-week high closing price of $2.40, and was significantly below the indications of interest the Company received from other bidders between February 2016 and February 2017, which ranged as high as $3.75 per share.

5.      The Merger Consideration was also grossly inadequate compared to the implied values the Company's financial advisor, Evercore Group L.L.C. ("Evercore"), calculated in connection with its so-called "fairness opinion." Specifically, Evercore's valuation analyses indicated the Company's shares were worth *up to $3.97, 62% above the Merger Consideration*. And that is despite the fact that many of its valuation analyses appear to have been manipulated to drive the Company's implied value *downward*. As one sophisticated shareholder noted, "Based on Evercore's own analysis, it appears that Covisint was practically given away."[2]

6.      Defendants recognized that there was no need for the Company to enter into a merger, and that the Company had other viable strategic alternatives to increase shareholder value;

---

[2] *Dialectic Capital Issues Public Letter Announcing Intention to Vote Against OpenText's Acquisition of Covisint*, PRNEWSIRE (Jul. 19, 2017), http://www.prnewswire.com/news-releases/dialectic-capital-issues-public-letter-announcing-intention-to-vote-against-opentexts-acquisition-of-covisint-300490647.html (hereinafter, the "Dialectic Letter").

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

indeed, Director Defendants Andreas Mai and Jonathan Yaron made this point clear at multiple Board meetings.  Nevertheless, the Company's five other directors and its senior management, including President and Chief Executive Officer Samuel M. Inman, III and Chief Financial Officer Enrico Digirolamo (collectively, "Management") supported the Merger with OpenText because it (i) provided them with unique personal benefits, including the accelerated vesting of restricted stock units and stock options and significant "change in control" payments, and (ii) allowed them to leave their positions after years of criticism for poor job performance without further public embarrassment and avoid the significant risk of being fired or removed. Further, based on the preferential treatment OpenText was given during the sales process, it appears that OpenText was the preferred bidder of Management and certain members of the Board.  The Board's and Management's decision to support the Merger despite the grossly inadequate Merger Consideration was also driven by the will of certain activist investor hedge funds that began aggressively pushing the Company to seek acquirers in June 2016.

7.      Three of the Defendants, John F. Smith, Andreas Mai, and Jonathan Yaron, were appointed to the Board in August 2016 to appease Dialectic Capital Management LP ("Dialectic"), which had threatened to launch a proxy contest.  After recognizing that the Company's flawed strategic review process resulted in the grossly inadequate offer from OpenText, Messrs. Mai and Yaron urged the rest of the Board to pursue alternative courses of action to increase profitability and revisit a potential sale down the road. Their pleas fell on deaf ears, as the rest of the Defendants were committed to selling the Company now despite the grossly inadequate offer, and Mai and Yaron ultimately caved and agreed to rubber-stamp the deal rather than buck their colleagues.

8.      Dialectic similarly recognized that OpenText's $2.45 offer was "completely inadequate", explained that it was "wholly irresponsible" for the Company to be sold now after

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

posting strong first quarter financial results, and urged fellow shareholders to vote against the Merger.[3] As Dialectic explained in its letter:

> Following years of mismanagement under the leadership of the board of directors and management team resulting in a depressed valuation, we believe it is wholly irresponsible for the Company to be sold now after posting its first quarter of profits… The real tragedy is that after rejecting an offer in the range of $3.00 to $3.75 per share bid last spring and subsequently resisting efforts by shareholders to improve the Company, the Board elected to accept a 27% lower bid at the same time the Company posted a profitable quarter. This decision-making process calls into question the fitness of the members of the Board…[4]

9.      The Merger was ultimately approved by a razor-thin margin, with an unprecedentedly low 52.17% of the Company's outstanding shares voting to approve it.  When accounting for the approximately 4.66%[5] of the Company's shares owned or controlled by the Defendants and the Company's remaining executive officers, the Merger was not approved by a fully-informed, disinterested majority of the Company's shareholders.

10.      Various actions taken by Defendants during the strategic review process indicate that OpenText was their preferred suitor. Amongst other things, the Board, Management, and Evercore largely ignored one particularly interested bidder, identified in the Proxy Statement as Company C, which had submitted an indication of interest to acquire the Company for $3.00 to $3.75 per share in February 2016, and then continued to express interest in acquiring the Company for $3.00 to $3.50 per share after the Company announced its poor fourth quarter and full fiscal year 2016 results in June of 2016.  At the Board's instruction, Evercore brushed-aside Company

---

[3] Dialectic Letter, *supra* note 1.
[4] *Id.*
[5] The Defendants and remaining Covisint executive officers collectively owned 1,904,945 shares. At the close of business on the record date, 40,885,818 shares of Company common stock were outstanding and entitled to vote.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

C's overtures and informed Company C that it would contact Company C when Defendants were ready to discuss its indication of interest.  The Proxy Statement suggests that Covisint and Evercore had no meaningful contacts with Company C between June 2016 and January 2017, despite the fact that Company C was seriously interested in acquiring Covisint.

11.     Further, the Proxy Statement indicates that Defendants gave preferential treatment to OpenText and neglected other interested bidders during the period between February and May 2017, when several bidders sought to remain active in the sales process. The Board inexplicably delayed responding to one interested bidder, identified as Company D, and instead proceeded to enter into an exclusivity agreement with OpenText (the "Exclusivity Agreement").  Evercore, at the Board's instruction, also ignored an overture from another interested bidder identified as Company I, despite the fact that Covisint was not yet bound by the Exclusivity Agreement.

12.     Defendants' preferential treatment towards OpenText may have been the result of a preexisting relationship between Defendant David Hansen ("Hansen") and OpenText's CEO, Mark Barrenechea ("Barrenechea"). Barrenechea bypassed the usual process of contacting Covisint's financial advisor or Management, and instead contacted Hansen directly in April 2017, when OpenText was ready to re-engage in discussions regarding a merger.  Barrenechea also initially contacted an unidentified Board member on or around May 28, 2016, when Barrenechea first expressed interest in a possible merger.

13.     Simply put, the inadequate Merger Consideration was the result of a strategic review process that was motivated primarily by unjustified pressure to sell the Company now so that certain hedge fund shareholders could exit their investments in the Company, as well as the self-interest of the Defendants.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

14.     As a result of the Merger, the Defendants collectively have or will receive millions of dollars in personal benefits, including "change in control" payments and the accelerated vesting of restricted stock units and options.

15.     Compounding the failure to obtain fair consideration for Covisint shareholders, Defendants also breached their fiduciary duties and acted in bad faith by agreeing to unreasonable deal-protection provisions in the Merger Agreement that unfairly favored OpenText and impeded other potential bidders from submitting a superior offer to acquire Covisint.  These preclusive devices included: (i) a strict non-solicitation provision that restricted the Board from soliciting other potentially superior offers; (ii) an "information rights" provision, which provided OpenText with unfettered access to information about other potential proposals, gave OpenText several business days to negotiate a new deal with Covisint in the event a competing offer emerged, and provided OpenText with the perpetual right to attempt to match any superior bid; and (iii) a termination fee of $3.85 million, and a provision that required Covisint to pay OpenText $750,000 in expenses under certain circumstances.  Combined, the terminate fee and reimbursement requirement amounted to approximately 4.6% of the Merger's equity value, which was unreasonably high for a transaction of its size.

16.     Defendants further breached their fiduciary duties and acted in bad faith by requiring certain interested bidders to agree to "standstill" and "don't ask, don't waive" provisions in their confidentiality agreements. 12 such parties remained bound by these restrictions as of the shareholder vote on the Merger, which impeded them from offering Covisint shareholders a better deal.  The Defendants' insistence on including these restrictive provisions in the confidentiality agreements constitutes bad faith, and was a complete abdication of the Defendants' duty to maximize shareholder value.  The Proxy Statement failed to identify the specific bidders that

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

remained bound by these restrictive provisions, but it appears that bidders that had expressed serious interest in acquiring Covisint, including Company C and Company D, remained bound by these provisions as of the Merger vote date.

17.     The Board further exacerbated its breaches of fiduciary duty by disseminating a materially incomplete and misleading definitive proxy statement (the "Proxy Statement") to the Company's shareholders on June 26, 2017.  Specifically, the Proxy Statement failed to adequately disclose material information related to the Merger, including: i) the strategic review process leading up to the consummation of the Merger Agreement; ii) the financial analyses conducted by Evercore in support of its so-called "fairness opinion"; and iii) the Company's financial projections.

18.     As alleged in further detail below, the consideration Covisint shareholders received in connection with the Merger was unfair and inadequate, and the process by which Defendants conducted the strategic review and sales process was fundamentally flawed and failed to maximize shareholder value.

19.     The Defendants' conduct constituted a breach of their fiduciary duties owed to Covisint's former public shareholders, and a violation of applicable legal standards governing their conduct.

20.     For these reasons and as set forth in detail herein, Plaintiffs seek to recover damages resulting from the Defendants' violations of their fiduciary duties of loyalty, good faith, due care, and candor, and failure to maximize value in an amount to be determined at trial.

## JURISDICTION AND VENUE

21.     This Court has personal jurisdiction over Defendants because Covisint was a Michigan corporation that maintained its principal place of business in Southfield, Oakland County, Michigan, and the Defendants were each directors and/or officers of the Company who

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

are either citizens of Michigan or who have sufficient minimum contacts with Michigan as to render the exercise of jurisdiction over each Defendant by this Court permissible under traditional notions of fair play and substantial justice.

22.     Jurisdiction is proper in this Court pursuant to MCL § 600.715 and MCL § 600.605, because this is a civil action involving a Michigan corporation and the amount in controversy exceeds $25,000.

23.     This case is eligible for Business Court as set forth by MCL §600.8031.

24.     Venue is proper in this Court under MCL § 600.1621(a) because Covisint had a place of business in Oakland County, Michigan and the events at issue occurred in this County. Venue is also proper in this Court because Plaintiffs assert claims arising solely under Michigan state law.

**THE PARTIES**

25.     Plaintiffs were, at all relevant times, shareholders of Covisint.  As a result of the Merger, Plaintiffs were cashed out of the Company in exchange for the inadequate Merger Consideration.

26.     Defendant Sam Inman III was, at all relevant times, a director of Covisint and the President and Chief Executive Officer of the Company.  From 2008 to 2011, he was President and CEO of Comarco Wireless Technologies. Previous to Comarco, Mr. Inman was Executive Chairman of Think Outside; Co-CEO and Chairman for Viking Components, Inc.; CEO and President of Centura Software Corporation; President and COO of Ingram Micro and President of IBM PC Company, Americas.

27.     Defendant Enrico Digirolamo was, at all relevant times, Covisint's Chief Financial Officer. From 2010 until July 2013, Mr. Digirolamo served as a Senior Vice President at Allstate Insurance. Mr. Digirolamo was the Chief Financial Officer and Vice President of General Motors

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

Europe AG from 2008 to 2010. He currently serves on the board of directors of Metromedia International Group LLC and has also served as a member of the GM European Strategy Board, Opel Supervisory Board, chairman of the Saab Automobile Board of Directors, and the board of directors of GM Russia and Allstate New Jersey and Florida.

28.     Defendant John F. Smith was, at all relevant times, a director of Covisint and the Chairman of the Board. Mr. Smith has been a principal of Eagle Advisors LLC, a consulting firm in Bloomfield Hills, Michigan that specializes in strategy development and performance improvement since January 2011. Mr. Smith previously held positions with General Motors Corporation, Cadillac Motor Car, Allison Transmission.  Mr. Smith currently serves on the boards of American Axle & Manufacturing Holdings, Inc., CEVA Holdings LLC, and Arnold Magnetics. Mr. Smith also serves as an advisor to VNG.CO and Enginetics LLC. He previously served on the Board of Directors of Smith Electric Vehicles Corp. from June 2012 to December 2013, and on the Board of Plasan Carbon Composites from December 2013 to December 2014.

29.     Defendant Bernard M. Goldsmith served as a director of Covisint from November 2012 through the consummation of the Merger. Mr. Goldsmith is a general partner of Updata Partners, a private equity firm he co-founded in 1998 that invests in software, internet and business services companies. Mr. Goldsmith has previously served on the boards of directors of several publicly traded companies including: Goal Systems, Compuware, Alphanet, Astea and Frontstep.

30.     Defendant William O. Grabe was, at all relevant times, a director of the Company. Mr. Grabe is affiliated with General Atlantic, and also currently serves on the boards of Quality Technology Services, Lenovo Group Limited, and Gartner, Inc.

31.     Defendant David Hansen was, at all relevant times, a director of the Company. He is also currently President and CEO of SafeNet, a Maryland-based global provider of high-value

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

data protection. Before that, he was a General Manager at BMC Software following the company's 2012 acquisition of Numara Software.

32.     Defendant Andreas Mai was, at all relevant times, a director of the Company. Mr. Mai was previously affiliated with Cisco Systems, Inc., Octo Telematics, Cohda Wireless, the Connected Vehicle Trade Association, the Connected Car Council, the World Economic Forum, PRTM Management Consultants, and Roland Berger Strategy Consultants.

33.     Defendant Jonathan Yaron was, at all relevant times, a director of the Company. Mr. Yaron also currently serves as executive Chairman of Accellion, Inc. Since 2007, Mr. Yaron has been President and Chief Executive Officer of JY Investments, which provides investment and consulting services to private companies and private equity firms.  From 1997 through 2013, Mr. Yaron was Chairman and Chief Executive Officer of Enigma Information Retrieval Systems, Inc., a software company he co-founded in 1992 that was sold to PTC, Inc. in 2013.

### THE DEFENDANTS' FIDUCIARY DUTIES

34.     By reason of the Defendants' positions as former directors and/or officers of Covisint, said individuals were in a fiduciary relationship with Plaintiffs and the other public shareholders of Covisint and owed Plaintiffs and the other members of the Class (defined herein) the duties of care, loyalty, good faith, candor, and a duty to maximize shareholder value.

35.     Common law imposes fiduciary duties on officers and directors of Michigan corporations. *Murphy*, 509 Mich at 147-48.

36.     By virtue of their positions as directors and/or officers of Covisint, the Defendants, at all relevant times, had the power to control and influence, and did control and influence and cause Covisint to engage in the practices complained of herein.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

37.     Each of the Defendants was required to act in good faith, in the best interests of the Company's shareholders and with such care, including reasonable inquiry, as would be expected of an ordinarily prudent person.

38.     In a situation where the directors and officers of a publicly traded company undertake a transaction that may result in a change in corporate control, the directors must take all steps necessary to maximize the value shareholders will receive or obtain a sizeable premium.  To diligently comply with this duty, the directors of a corporation may not take any action that:

(a)     adversely affects the value provided to the corporation's shareholders;

(b)     contractually prohibits them from complying with or carrying out their fiduciary duties;

(c)     discourages or inhibits alternative offers to purchase control of the corporation or its assets;

(d)     will otherwise adversely affect their duty to search for and secure the best value reasonably available under the circumstances for the corporation's shareholders; or

(e)     will provide the directors and/or officers with preferential treatment at the expense of, or separate from, the public shareholders.

39.     The Board's fiduciary obligation to maximize shareholder value also required it to reject inadequate offers to purchase the Company and to maintain the Company's operations as a standalone entity if the alternative was a sale at an inadequate price.  Defendants were obligated to seek the path offering the best value reasonably available to the stockholders, which could be remaining independent and not engaging in any transaction at all.

40.     Further, when directors and officers agree to a transaction that requires shareholder approval, they have a duty to disclose all information that is material to the shareholders'

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

consideration of the transaction that can reasonably be obtained through their position as directors and officers.

41. Plaintiffs allege herein that the Defendants, separately and together, in connection with the Merger, violated duties owed to Plaintiffs and the other public shareholders of Covisint, including their duties of loyalty, good faith, care, candor, and to maximize shareholder value, and acted in bad faith, insofar as they, *inter alia*: failed to obtain the best price possible or a reasonable premium under the circumstances before entering into the Merger; ignored clear indications that OpenText's offer grossly undervalued the Company; abandoned other viable strategic alternatives and business plans to maximize shareholder value; agreed to unreasonable deal protection devices that all but ensured that Covisint's shareholders would not receive a superior offer; contractually prohibited interested parties from taking steps to offer Covisint shareholders a better deal; engaged in self-dealing and obtained for themselves personal benefits, including personal financial benefits, not shared equally by Plaintiffs or the other holders of Covisint common stock; and disseminated a materially incomplete and misleading Proxy Statement to the Company's shareholders which deprived them of the ability to make an adequately informed decision regarding the Merger.

## SUBSTANTIVE ALLEGATIONS

### A. The Merger Consideration Inadequately Compensated Shareholders in Light of Covisint's Core Technology, Net Cash Reserves, and Future Outlook.

42. In October 2013, Covisint was carved out of Compuware Corporation ("Compuware") through an initial public offering (IPO) of Covisint's common stock. After the Company's IPO, Compuware retained approximately 82% of the outstanding shares of the Company's stock. In October 2014, Compuware distributed its entire holding of Covisint stock to its shareholders. This placed severe downward pressure on Covisint stock, and caused the price to fall dramatically. By November 2014, Covisint's stock was trading at approximately $2.50 per

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

share. Covisint is debt free and has substantial cash reserves of over $30 million, yet the stock still trades at just 1x the subscription revenue (typical industry multiples are 2-5x revenue). Despite significant net cash reserves and the strength of their underlying technology, Covisint's stock price had not yet recovered from this traumatic corporate event.

43.     Covisint provides an open enterprise class cloud platform (Platform) enabling organizations to build solutions that identify, authenticate, and connect users, devices, applications, and information. The Company's Auto Supply Portal is involved in the development and integration of three cloud-based technologies – identity management, data integration and exchange services, and portal services. The Company's Platform is delivered through the cloud via a Platform as a Service (PaaS). The Company's Platform supports production-critical applications and offers security, scalability, and reliability. The Platform's various capabilities include identity services, messaging and orchestration services, and Internet of Things (IoT) Services. Its customers include large, global organizations and mid-sized organizations with external business relationships, as well as the participants in their business relationships. Its core Platform customers include organizations in the automotive, energy, travel, life sciences, consumer goods and national and regional insurance industries.

44.     As one of the founding fathers of cloud identity and access management, Covisint is well positioned in the IoT space. The Company's technology underlying the Platform is the best among leading IoT platforms, because of its superior depth, complexity, and sophistication. Covisint, recognized as the industry standard, has perhaps the largest IoT installation in the world in GM OnStar. The Company has long-term contracts with blue-chip corporations such as GM, Ford, Hyundai, Cisco, Shell, and Coca-Cola. Covisint possesses a highly recurring subscription revenue stream with 95% renewal rates coupled with gross margins over 50%. As is common with

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

emerging growth companies, especially early-adopting technology companies, valuation can be difficult based on performance metrics alone. Due to the strength of Covisint's core technology, financial experts strongly believed that the Company warranted a significant premium to its then-current stock price in any strategic alternative transaction.

45.     Once rumors of a sale got out to the financial community, many financial analysts forecasted the Merger Consideration at a much higher price. Analysts best estimations valued Covisint at a per share price of $3 to $5 in a strategic alternative transaction, such as the Merger. Thus, the $2.45 Merger Consideration inadequately compensated shareholders in light of Covisint's core technology, net cash reserves, and future outlook.

46.     Indeed, on February 11, 2016, Company C made the first disclosed offer to acquire Covisint for $3.00 -$3.75 per share. Covisint decided to reject the offer as inadequate. A week later, on February 17, 2016, Covisint informed Company C that it was not interested in pursuing discussions with Company C. There is no indication that Covisint attempted to negotiate the offer price with Company C, or even keep channels of communication open for future negotiations.

47.     This flawed sales process continued for another 16 months, until Defendants approved the Merger Agreement with OpenText at a price of $2.45 per share. The Merger Consideration represented approximately a 90 point reduction in premium per share from Company C's opening offer, which was viewed as an inadequate price to begin with. Furthermore, at the time of the deal, there were more lucrative strategic alternatives available to the Company.

48.     The Defendants were fully aware that the Merger Consideration undervalued the Company, but nevertheless approved the Merger.  Specifically, Defendants Mai and Yaron repeatedly disfavored entering into a merger agreement at such a low price. At Board meetings on March 27, April 1, and June 4, 2017, they contended that any deal to sell the Company at such a

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

low price would be detrimental to shareholder value, and noted that the Company had other viable strategic alternatives to increase shareholder value, including reducing expenses as part of a broader restructuring strategy, and thereby enabling the Company to pay dividends and/or to make strategic investments in the growing IoT market.

49.     Defendants were also aware that the valuation analyses performed by Evercore in support of its fairness opinion had been cherry-picked, were based on illogical assumptions, and were manufactured downward in an attempt to justify a sale of the Company at the $2.45 offer price.   For example, the multiples that Evercore applied were blatantly out of place and inappropriate, and Evercore assumed a negative perpetual growth rate in connection with its discounted cash flow analysis despite the fact that Company revenues showed growth.   In an act of bad faith, Defendants ignored these tell-tale signs of manipulation, ignored the fact that the Merger Consideration was well below the Company's value, and proceeded to approve the Merger anyway.

50.     In sum, Defendants' intentional decisions and the extremely flawed sales process they conducted significantly and directly harmed Covisint shareholders. Defendants failed in their duty to take all steps necessary to maximize the value shareholders received and obtain a reasonable premium. The $2.45 Merger Consideration inadequately compensated shareholders in light of Covisint's core technology, net cash reserves, future outlook, and other potential offers. As Dialectic summarized in its press release criticizing the Defendants and the Merger:

> Plain and simple, we believe the $2.45 per share price that is being offered to Covisint shareholders is completely inadequate. The current offer is seemingly representative of a company in secular decline with no growth opportunities, low margins and no proprietary technology – none of which is the case with Covisint... Based on Evercore's own analysis, it appears that Covisint was practically given away… We believe Covisint participates in one of the most exciting areas of tech, and if it is able to execute on any of

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

management's internal projections, the justified EV/EBITDA multiple would be well above 10x. If the Company does roughly $20 million of EBITDA and is able to generate some revenue growth, as detailed in the "Sensitized Projections," then applying a 10x EV/EBITDA multiple results in a stock price of $5. Even discounted back to present value, this results in a per share value well above the current offer. If revenue growth is in line with the "Base Case Projections" (i.e. much higher), then we believe an even higher multiple would be justified. How can the Board recommend an offer representing an EV/EBITDA multiple of roughly 3.5x?... OpenText indicated that the acquisition of Covisint would be 2% accretive in the upcoming fiscal year ending June 2018. This implies around $13 million of acquired net income for which it is paying $70 million. Notwithstanding our beliefs that the implied income is conservative and there are obvious synergies through which it could be further improved, to be able to acquire a viable tech business for roughly five times net income is absurd. We believe OpenText is getting a sweetheart deal that significantly undervalues Covisint shares… The real tragedy is that after rejecting an offer in the range of $3.00 to $3.75 per share bid last spring and subsequently resisting efforts by shareholders to improve the Company, the Board elected to accept a 27% lower bid at the same time the Company posted a profitable quarter. This decision-making process calls into question the fitness of the members of the Board to continue to serve as fiduciaries of the Company's shareholders… Under the right leadership, we believe there is a viable path forward for the Company that is more attractive than the current offer… we believe the Company could be sold in the future for a much higher price… We do not believe that a sale now at the proposed price is advisable as we believe it significantly undervalues the Company's prospects.[6]

**B.    Defendants Conducted a Severely Flawed Sales Process During Which They Failed to Adequately Pursue Higher Offers, Unfairly Favored OpenText, Neglected Other Bidders, and Declined to Pursue Other Viable Strategic Alternatives to Maximize Shareholder Value.**

51.    The inadequate $2.45 per share Merger Consideration is the result of a fundamentally flawed sales process led by Defendants, which wholly failed to maximize shareholder value.

---

[6] Dialectic Letter, *supra* note 1.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

52.     On February 11, 2016, Covisint received its first indication of interest from Company C, which proposed purchasing Covisint for an all cash price of between $3.00 and $3.75 per share. Company C's letter indicated that it would fund the acquisition with cash on hand and through existing debt facilities.

53.     Company C's initial indication of interest came a mere week after Covisint had reported its third quarter fiscal 2016 financial results, during which Covisint noted that its subscription revenue had decreased by 3% year-over-year and adjusted its guidance for subscription revenue and total revenue downward for fiscal year 2016.  In other words, Company C believed Covisint was worth $3.00 to $3.75 per share even after the Board had revised its revenue guidance downward.

54.     A few weeks after Company C submitted its indication of interest to acquire Covisint for up to $3.75 per share, Company C's Chief Executive Officer met with Mr. Inman and explained that Company C's offer was directly related to the size of Covisint's pipeline.  In other words, Company C's offer was not premised upon the present trading price of Covisint common stock or Covisint's recent financial performance, but rather, was based upon Covisint's prospects for future growth.

55.     The Board refused to negotiate with Company C or allow Company C to complete its requested due diligence.  Instead, the Board summarily rejected Company C's initial offer, waited a week, and then told Company C that Covisint had no interest in pursuing further discussions.  The Board believed that the price range set forth in Company C's indication of interest failed to adequately represent the long-term prospects of Covisint.  In other words, as of February 2016, the Board was adamant that Covisint was worth much more than $3.75 per share.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

56.    On June 6, 2016, Covisint reported fourth quarter and fiscal year 2016 financial results. In a press release issued by Covisint in connection with the earnings announcement, Covisint noted that, while the Company had achieved year-over-year margin improvement, its total revenue, subscription revenue and services revenue decreased by 14%, 4% and 43%, respectively, compared to the prior year.  In addition, on a quarterly basis compared to Covisint's prior year quarterly period, total revenue, subscription revenue and services revenue had decreased 15%, 6% and 45%, respectively.  In the earnings call for the third quarter of fiscal year 2016, Covisint lowered guidance for the fiscal year as a result of Covisint achieving annual subscription revenue ("ASR") or new bookings that were substantially lower than what was anticipated by Covisint.

57.    Despite these particularly poor financial results, the very next day Company C submitted another indication of interest to Covisint stating that it was following up on the letter it sent in February of 2016 and offering to acquire Covisint for an all cash price of between $3.00 and $3.50 per share.  In other words, despite the fact that it had been largely ignored by the Board for four months and that Covisint had just announced poor financial results, Company C remained interested in acquiring Covisint at a price range similar to the range it had proposed back in February of 2016.  The timing and price range of Company C's second indication of interest illustrate that Covisint's value is tied to its growth prospects rather than its present day operating results.

58.    On June 14, 2016, Mr. Inman met with the Chief Executive Officer of Company C. Company C's Chief Executive Officer reiterated to Mr. Inman Company C's interest in pursuing a strategic transaction with Covisint, and that Company C was particularly interested in Covisint's pipeline.  During the discussion, Mr. Inman informed Company C's Chief Executive Officer that Covisint had engaged Evercore to evaluate strategic alternatives for Covisint.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

59.     On June 24, 2016, representatives of Company C's financial advisor communicated to representatives of Evercore that Company C was interested in exploring a transaction with Covisint at an all cash price range of $3.00 to $3.50 per share, as stated in the June 7, 2016 letter from Company C.  Representatives of Evercore essentially blew off Company C, and stated that they would contact Company C when Defendants were ready to have a discussion.

60.     On July 12, 2016, the Board held a telephonic meeting with members of Covisint's senior management team and representatives of Evercore in attendance. While representatives of Evercore provided an update on their progress in preparing marketing materials for Covisint and managing communications with potential bidders, it is unclear if Evercore specifically informed the Board of its June 24th conversation with Company C and that Company C continued to express strong interest in acquiring Covisint for $3.00 to $3.50 per share.  It is also unclear if the Board or Management ever bothered to ask Evercore whether it had heard from Company C after June 14, 2016, the date Mr. Inman informed Company C's CEO that Covisint had engaged Evercore.

61.     The Board held its next meeting on August 3, 2016 at Evercore's offices in New York City.  Once again, it is unclear if Evercore specifically informed the Board of its June 24th conversation with Company C and that Company C had continued to express strong interest in acquiring Covisint for $3.00 to $3.50 per share. It is also unclear if the Board or Management bothered to ask Evercore whether it had heard from Company C after June 14, 2016.

62.     The next Board meeting at which Evercore was present occurred on October 4, 2016.  Once again, it is unclear if Evercore specifically informed the Board of its June 24th conversation with Company C and that Company C had continued to express strong interest in acquiring Covisint for $3.00 to $3.50 per share. It is also unclear if the Board or Management bothered to ask Evercore whether it had heard from Company C after June 14, 2016. Further, while

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

the Board authorized Evercore to continue informal discussions with certain key potential strategic acquirers, it is unclear if Company C was included as one of the "key" potential acquirers Evercore was instructed to talk with.  However, based on the fact that Evercore did not re-connect with Company C until January 6, 2017, it appears that Company C was not.

63.     On January 6, 2017, seven months after Company C had submitted its second indication of interest to acquire Covisint for up to $3.50 per share, someone from Evercore finally decided to re-connect with Company C's financial advisor and shared a confidentiality agreement to be used by Company C if it wished to pursue discussions with Covisint as part of the sale process.  The Proxy Statement failed to disclose whether the confidentiality agreement with Company C contained a "standstill" or "don't-ask-don't-waive" provision, which was material information given that Company C had previously indicated that it could make a hostile offer to acquire Covisint.

64.     In sum, between February 2016 and January 2017, the Board, Management, and Evercore largely blew off Company C, despite its repeated expressions of interest in acquiring Covisint for $3.00 to $3.50 per share.

65.     The strategic review process that unfolded in the months thereafter was similarly flawed, as the Board, Management, and Evercore gave preferential treatment to OpenText, to the detriment of other interested bidders. The Board ultimately rubber-stamped the Merger despite recognizing that there was no need to sell Covisint at this time, given the other viable strategic alternatives to increase shareholder value.

66.     On January 11, 2017, Covisint and OpenText executed a confidentiality agreement. Representatives of Evercore had a conversation with a representative of OpenText who requested

more detail about the next steps in the process.  Representatives of Evercore told a representative of OpenText that it would follow-up with OpenText on next steps.

67.     On January 17, 2017, Evercore distributed a confidential information memorandum to OpenText and requested dates that the OpenText team would be available for an in-person meeting with Covisint's senior management team.  It is unclear which other bidders were provided with the confidential information memorandum, and when they were provided with it.

68.     On January 20, 2017, a representative of OpenText confirmed scheduling an in-person management presentation with Covisint in Detroit, Michigan on February 6, 2017, and told representatives of Evercore that OpenText wanted exclusivity prior to engaging in a full due diligence exercise.

69.     On February 1, 2017, representatives of Evercore had a conversation with a representative of OpenText to review OpenText's questions following OpenText's review of the confidential information memorandum.  During the conversation, representatives of Evercore and a representative of OpenText also discussed the meeting agenda for the confidential management presentation scheduled for February 6, 2017 and the participants that would be attending the meeting.

70.     On February 6, 2017, Messrs. Inman, Digirolamo, Steven Asam, the Company's Chief Technology Officer, and a representative of Evercore met with representatives of OpenText at an off-site meeting location near Covisint's headquarters for an in-person management meeting.

71.     On February 9, 2017, Covisint announced its financial results for the third quarter of fiscal year 2017.  While Covisint reported a decrease in total revenue, it also reported that GAAP gross margin was 49%, compared to 48% in the prior fiscal quarter, Non-GAAP gross margin was 56%, compared to 55% in the prior fiscal quarter, and Non-GAAP net loss was $3.5 million per

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

diluted share, compared to a net loss of $3.8 million per diluted share in the same period the previous year.  In commenting on the third quarter results, Mr. Inman indicated that Covisint's future growth prospects remained strong, stating:

> During the third quarter, we achieved total revenue of $16.6 million, which included $14.7 million in subscription revenue. We finished the quarter with over $30 million in cash, which was in-line with our expectations. Earlier, we announced our shift in focus towards our core heritage, the automotive vertical. I have been pleased with the progress we have made and the make-up of our new team. **The quality of our pipeline is improving, and we are seeing new account opportunities, not only in Cloud Identity, but also in Connected Car**.[7]

As noted earlier, Covisint's intrinsic value is tied to its pipeline.

72.     Also on February 9, 2017, Evercore distributed a process letter to certain interested parties stating that indications of interest to acquire Covisint were due by February 22, 2017. However, OpenText failed to meet this bid deadline, and on February 24, 2017, representatives of Evercore had a telephonic conversation with a representative of OpenText.  A representative of OpenText indicated OpenText's strong interest in Covisint and that it hoped to submit a proposal during the week of February 27, 2017, but OpenText missed its own deadline as well, and did not submit its indication of interest until March 6, 2017, nearly two weeks later than the other bidders were required to submit their bids.

73.     On February 26, 2017, the Board held a meeting with Management, with representatives of Evercore and Paul Hastings in attendance.  Evercore advised the Board that on February 22 and 23, 2017, Evercore had received written indications of interest from two financial buyers, Company B and Company D, and two strategic bidders, Company M and Company I.

---

[7] *Covisint Corporation Announced Third Quarter Fiscal 2017 Financial Results*, February 9, 2017, http://files.shareholder.com/downloads/AMDA-270D5X/4682301040x0x927422/610062BF-4596-4D62-B506-EAB53604306B/COVS_News_2017_2_9_General_Releases.pdf.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

Company D's indication of interest proposed an all cash bid price of between $2.25 and $2.50 per share, and did not contain a financing contingency; Company B's indication of interest proposed an all cash bid price of between $2.25 and $2.50 per share with no financing contingency; Company M's indication of interest provided for a fixed all cash bid price of $2.19 per share, to be financed with cash and debt; and Company I's indication of interest proposed an all cash bid price of between $2.25 to $2.75, payable with cash on hand.  In addition, Evercore's representatives advised the Board that, while they had not received anything in writing, OpenText had orally indicated to Evercore that it anticipated submitting a written indication of interest within the coming week.  The Board authorized Mr. Smith, chairman of the Board, to evaluate any indication of interest from OpenText to determine whether to provide OpenText with access to the electronic data room and management.

74.     Armed with the price ranges bidders were willing to pay to acquire Covisint, the Board suddenly requested that Management update its Base Case projections and prepare a Sensitized Case of financial projections.  Management had already previously prepared Base Case Projections, which were analyzed by Evercore during the Board's August 3, 2016 meeting. Upon the Board's request, Management updated the Base Case Projections in March 2017, which reflected continued operation of Covisint's business assuming a focus on automotive customers and a "land and expand" growth operating scenario.  Management also prepared the Sensitized Case Projections, which are an alternative three-to-five-year set of projections reflecting a conservative view of Covisint's potential future business performance, assuming that Covisint's revenue growth remained nearly flat.  The Board's instruction to Management to revise the Base Case Projections and prepare the conservative Sensitized Case Projections appear to have been based upon the need to ensure Evercore had sets of projections it could use to justify a fairness

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

opinion at the valuation ranges reflected in the indications of interest Covisint received in February 2017.  Defendants omitted the pre-May 2017 iterations of the Base Case Projections from the Proxy, and therefore Covisint shareholders were unable to assess the significance of the changes that were made to the twice-altered Base Case Projections.

75.     On February 27, 2017, representatives of Evercore had a discussion with a representative of OpenText regarding OpenText's internal timeline to determine whether OpenText would proceed with providing an indication of interest to the Company.

76.     On March 6, 2017, two weeks after the bid deadline the Board set, OpenText submitted an indication of interest to acquire Covisint at a price of $2.15 per share in cash. OpenText was informed that its offer was inadequate, and on March 9, 2017, OpenText indicated it was willing to increase its offer to $2.35 per share if it were given exclusivity.  During the period between March 14 and March 15, 2017, representatives from Evercore had multiple conversations with a representative of OpenText, during which he re-affirmed OpenText's intention to submit a revised indication of interest with an increased all cash price of $2.35 per share, but only upon Covisint granting OpenText exclusivity.

77.     On March 16, 2017, representatives of Evercore updated Mr. Smith and Management on the status of discussions with OpenText.  Representatives of Paul Hastings discussed the Board's fiduciary duties in the context of a sale or transaction, yet the Board failed to fulfill its duties.  Following the discussion, Evercore was instructed to continue discussions with OpenText.

78.     On March 17, 2017, representatives from Evercore had a conversation with a representative of OpenText, during which he indicated that OpenText would be submitting a

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

revised indication of interest with an increased all cash bid price of $2.45 per share, as well as a request for exclusivity.

79.     Finally, on March 20, 2017, nearly a month after Company D and Company I had submitted their timely bids (the high ends of which both exceeded OpenText's best, negotiated offer), someone bothered to follow-up with them.  Specifically, representatives of Evercore verbally communicated to Company B, Company D, and Company I on separate calls, that they should provide their final bids by March 30, 2017, including a mark-up of the definitive merger agreement. At the direction of Covisint management, Evercore also indicated to each bidder that it would be helpful if each could submit a single bid price (as opposed to a range) prior to March 27, 2017.

80.     The chronology of events between February 22, 2017 and March 20, 2017 indicate that OpenText was the preferred bidder of the Board, Covisint Management, and Evercore. OpenText was allowed to submit its indication of interest two weeks past the deadline, and the Board and Covisint Management let nearly a month lapse between the date Company D and Company I submitted their higher indications of interest, and the date someone finally got back to them with a response to their bids and further instructions on how to proceed.  When someone from Evercore did finally communicate with Company D and Company I on March 20, 2017, the companies were rushed and instructed to submit a final single bid price in less than a week, and to submit a mark-up of the merger agreement by March 30, 2017.

81.     On March 24, 2017, representatives of Evercore had a telephone conversation with representatives of Company D, during which the representatives of Company D explained that its bid price was not binary or linearly related to the range of ASR bookings. The representatives of Company D noted that they would be able to bid *at the higher end* of their all cash $2.25 to $2.50

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

per share range if additional information could be provided reflecting the Company's path to profitability.

82.     On March 27, 2017, the Board held a meeting with members of senior management and representatives of Evercore and Paul Hastings in attendance. Prior to the meeting each member of the Board received a copy the Base Case Projections and the Sensitized Projections for the Company, as previously requested by the Board, as well as a presentation from Evercore on the status of the strategic process.  Representatives of Evercore informed the Board that it had received a revised, written indication of interest from OpenText with an all cash purchase price of $2.45 per share, but that OpenText was not willing to mark up the definitive merger agreement unless the Company granted OpenText exclusivity. Representatives of Evercore also informed the Board that it had received a revised written indication of interest from Company I with an offer price of $2.25 per share in cash.  Messrs. Mai and Yaron indicated that they did not favor a sale of the Company in the $2.50 range at such time and believed that the Company should either pursue a course of action for the business similar to the Sensitized Projections or other alternatives to increase profitability, with a goal to potentially explore strategic alternatives again in twelve months. Nevertheless, the majority of the Board dictated that they move forward with the sale process despite the inadequacy of the offers received.

83.     On the morning of April 1, 2017, Company D sent an e-mail to a representative of Evercore indicating that Company D remained within its original all cash range of $2.25 to $2.50 per share based on the latest discussions on ASRs and the potential for future profitability. Company D also indicated that it had internal support for a fixed price of $2.35 per share, and could potentially work towards a higher bid subject to additional confirmatory due diligence.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

84.     Despite Company D's indication that it could work towards a bid of up to $2.50 per share if it was provided with additional due diligence, on the evening of April 1, 2017, the Board held a telephonic meeting during which it directed Evercore to request that OpenText increase its offer to $2.50 per share in exchange for a three-week exclusivity period to OpenText. Messrs. Mai and Yaron again reiterated that the Company should pursue the Sensitized Projections or pursue other alternatives to increase profitability rather than agree to a merger at the unfair offer prices. Nevertheless, a majority of the Board dictated that the Company continue the sale process.

85.     On April 2, 2017, representatives of Evercore had a telephonic conversation with a representative of OpenText during which they noted the Board's request to OpenText regarding increasing its offer to $2.50 and granting exclusivity on the terms the Board had authorized. A representative of OpenText indicated that he would take the request back to OpenText for consideration and get back to Evercore as soon as he had an answer.

86.     On April 6, 2017, the Board held a telephonic meeting with members of senior management with representatives of Evercore and Paul Hastings in attendance. Evercore noted that at the time of the Board meeting, OpenText had not finalized its response to the Company's request that OpenText increase its offer from $2.45 to $2.50 in return for exclusivity. The Board directed Evercore to request that OpenText promptly respond to the Company's offer of exclusivity at $2.50 per share and also share the flash fiscal year 2017 results with OpenText. The Board directed Evercore to remove Company B and Company I from the process. The Board decided to wait to respond to Company D until the Company received further feedback from OpenText. In other words, it appears that the Board delayed providing Company D with the additional diligence it requested, because it preferred entering into exclusivity with OpenText.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

87.     On April 6, 2017, Evercore provided a representative of OpenText with the Company's flash fiscal year 2017 financials.  It is unclear if Company D or Company I were ever provided with this information.

88.     On April 7, 2017, a representative of OpenText informed Evercore that OpenText did not yet have a response to the Company's offer of exclusivity for a $2.50 purchase price and that OpenText would respond as soon as they had an answer.  The Board continued to delay its response to Company D.

89.     On April 13, 2017, consistent with direction from the Board, a representative of Evercore emailed a representative of OpenText for an update, following up on an unreturned phone call.  The Board continued to delay its response to Company D.

90.     On April 18, 2017, Mr.  Barrenechea directly contacted Mr. Hansen, a member of the Board, rather than going through the traditional communication channel, Evercore.  Mr. Barrenechea indicated to Mr. Hansen that OpenText wanted to re-engage in discussions with the Company.  That same day, representatives of Evercore sent to OpenText a revised flash summary for the Company's fiscal year 2017.  While the revised flash summary was also posted to the electronic data room, it is unclear if Company D or any of the other interested bidders were made aware that it had been posted.  The Board continued to delay its response to Company D.

91.     On April 20, 2017, Mr. Barrenechea indicated that he would respond to Evercore with a confirmed bid price.  The Board continued to delay its response to Company D.

92.     On April 21, 2017, a representative of Company I emailed representatives of Evercore to follow up on the status of the sale process, noting it had been about three weeks since Evercore had last discussed the transaction with Company I.  Evercore did not respond to Company

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

I, despite the fact that Covisint was not bound by an exclusivity agreement as of that date and it had still not received a confirmed bid price from OpenText.

93.     On April 25, 2017, Evercore received an inbound request for a conversation from Company K, a potential acquirer that had previously entered into a confidentiality agreement with Covisint.  The Board continued to delay its response to Company D.

94.     On April 27, 2017, representatives of Evercore had a discussion with Company K during which Company K indicated that it would like to receive a copy of the confidential information memorandum and was interested in updating its strategic analysis of Covisint.

95.     Also on April 27, 2017, a representative of OpenText called representatives of Evercore to inform them that OpenText was prepared to move forward with an all cash offer of $2.45 per share, provided that it received exclusivity. A representative of OpenText also indicated that OpenText was not willing to increase its bid to $2.50 per share and that the OpenText team and its legal advisors were ready to commence the diligence and documentation process.  In other words, Defendants had blown off Company D for weeks and ignored Company I's inquiry, and ultimately were unable to even obtain the $2.50 price they had demanded from OpenText in exchange for exclusivity (the same $2.50 price multiple members of the Board had previously indicated was inadequate).

96.     On April 28, 2017, Evercore received an updated written indication of interest from a representative of OpenText, which provided for an all cash offer of $2.45 per share.  In addition, OpenText insisted on a 30-day exclusivity period while it finalized due diligence, site visits, and a definitive agreement. Over the weekend, as directed by the Company, representatives of Evercore discussed revisions to the terms of exclusivity with OpenText.  The Board continued to ignore Company D and Company I, and did not follow-up with Company K.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

97.     On April 30, 2017, the Board held a meeting with members of senior management with representatives of Evercore and Paul Hastings in attendance. The Board discussed OpenText's request for exclusivity with the representatives from Evercore and Paul Hastings. After further discussion, the Board authorized management to grant exclusivity to OpenText, which OpenText agreed to, and expeditiously move to provide OpenText with any remaining diligence items and execute a definitive agreement.  The Defendants were only willing to move expeditiously for one bidder, OpenText.  Also on April 30, 2017, the Company entered into exclusivity with OpenText and on May 1, 2017 representatives of OpenText were granted access to the electronic data room.

98.     Sometime in May 2017, shortly after entering into the exclusivity agreement with OpenText based upon its $2.45 offer price (which was 30 cents less than the highest range of bids Covisint received before it previously had Management revise its projections), Management once again updated the Base Case Projections.  It is unclear how the Base Case Projections changed between March and May of 2017, because the Proxy Statement failed to provide shareholders with this material information.

99.     On May 3, 2017, a representative of Company I emailed representatives of Evercore to follow up on the status of the sales process. Evercore purportedly responded that no further update was available at this time. It is unclear if Company I was ever informed that Covisint had entered into an exclusivity agreement with OpenText based upon an offer price of $2.45 per share.

100.     On May 3, 2017, Company K submitted to Evercore a due diligence request. Evercore purportedly informed Company K that the Company had entered into exclusivity with a third party and was unable to provide any additional information. Company K presumably was

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

perplexed as to why no one from Evercore bothered to inform it that an exclusivity agreement with OpenText was in the works when Company K had discussion with Evercore a few days earlier.

101.    On May 11, 2017, a representative of Company I again emailed representatives of Evercore asking for an update on status of the process. Evercore responded that no further update was available at this time. It is unclear if Company I was informed that Covisint had entered into an exclusivity agreement with OpenText based upon an offer price of $2.45 per share.

102.    On May 17, 2017, a representative of Company I again emailed representatives of Evercore asking for an update on the process. Evercore again noted that no further updates were available at such time. It is unclear if Company I was informed that Covisint had entered into an exclusivity agreement with OpenText based upon an offer price of $2.45 per share.

103.    On May 31, 2017, a representative of Company D called a representative of Evercore to inquire about the process.  Evercore noted that it was under exclusivity with a third party and was unable to provide any additional information.  Company D presumably was perplexed as to why no one from Covisint or Evercore bothered to inform it that an exclusivity agreement with OpenText was in the works and why the Board, Management and Evercore had failed to respond to Company D for weeks.

104.    Between May 12 and June 5, 2017, representatives of Paul Hastings, the Company, OpenText and its legal advisor (Crowell & Morning LLP) negotiated the terms of the Merger Agreement. During this period, representatives of Crowell advised representatives of Paul Hastings that OpenText was also requesting that all directors and the members of the Company's senior management team that had been involved in the transaction sign voting agreements agreeing to vote their shares of the Company in favor of the transaction with OpenText.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

105.    On May 31, 2017, the 30-day exclusivity period with OpenText ended.  While the Board had still not finalized the Merger Agreement with OpenText as of that date, it did not communicate with any of the parties that had reached out during the exclusivity period, including Company D, Company K, and Company I.

106.    On Saturday, June 3, 2017, the Board convened a meeting to consider the Merger. Representatives of Evercore reviewed with the Board its financial analyses of the Merger, which indicated that Covisint was worth up to $2.63 per share under a Discounted Cash Flow Analysis, $3.20 per share under a Peer Group Trading Multiples Analysis, $3.97 under a Precedent Mergers Analysis, and $2.93 under a Premiums Paid Analysis, all based upon the latest revision of the Company's financial projections. Representatives of Paul Hastings then advised the Board on several issues that had been under negotiation with representatives of OpenText, and then summarized for the Board the material terms of the Merger Agreement and the Voting Agreement, including the preclusive deal protection provisions in the Merger Agreement that significantly impede other interested parties, such as Company D, Company K, and Company I, from submitting superior proposals. The Board engaged in a discussion of the Merger, including specific discussion regarding the cons of the Merger. Defendant Mai expressed that there were other viable strategic alternatives to increase shareholder value, including reducing expenses as part of a broader restructuring strategy, to make the Company profitable, and thereby enabling the Company to pay dividends and/or to make strategic investments in the growing IoT market.  Despite recognizing that there was no legitimate need for Covisint to enter into the Merger Agreement for the grossly inadequate Merger Consideration, each Board member nevertheless agreed to vote in favor of the Merger.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

107.    Between June 3 and June 5, 2017, representatives from Paul Hastings and Crowell negotiated several remaining points on the Merger Agreement and the Company and OpenText finalized and exchanged signature pages to the Merger Agreement and the Voting Agreements after the close of market trading on the afternoon of June 5, 2017. Thereafter, each of the Company and OpenText issued press releases announcing the Merger.

108.    Also on June 5, 2017, Covisint announced positive fourth quarter financial results, including the following: for the fourth quarter, GAAP gross margin was 60%, compared to 49% in the prior fiscal quarter; Non-GAAP gross margin was 66%, compared to 56% in the prior fiscal quarter and 65% in the same period last year; GAAP net income was $1.6 million or $0.04 per diluted share, compared to net loss of $0.1 million or ($0.00) per share in the same period last year; and Non-GAAP net income was $2.6 million or $0.06 per diluted share, compared to net loss of $0.5 million or ($0.01) per share in the same period last year.  Covisint also announced that the Company had $33.2 million in cash and cash equivalents at March 31, 2017, compared with $30.4 million at December 31, 2016.  Defendants were eager to finalize the Merger Agreement with OpenText prior to or concurrently with the announcement of the positive fourth quarter financial results, which further indicate that the Merger Consideration was inadequate.  As Dialectic explained in its letter: "it [was] wholly irresponsible for the Company to be sold now after posting its first quarter of profits…The real tragedy is that after rejecting an offer in the range of $3.00 to $3.75 per share bid last spring and subsequently resisting efforts by shareholders to improve the Company, the Board elected to accept a 27% lower bid at the same time the Company posted a profitable quarter. This decision-making process calls into question the fitness of the members of the Board…"[8]

---

[8] Dialectic Letter, *supra* note 1.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

109.    In sum, Defendants acted in bad faith and wholly failed to maximize shareholder value.  They oversaw a fundamentally flawed sales process, during which higher offers and better strategic alternatives to maximize shareholder value were not pursued, and other interested bidders were neglected in favor of finalizing a deal for the inadequate Merger Consideration with OpenText. As set forth below, Defendants also put their own self-interests before the fiduciary duties they owed to the shareholders. Defendants' intentional actions inflicted significant harm upon Covisint shareholders by depriving shareholders of fair consideration for their shares and the ability to partake in the Company's strong growth prospects.

**C.    Defendants Breached Their Fiduciary Duties to Covisint Shareholders and Acted in Self Interest by Caving to Pressure from Certain Activist Hedge Fund Investors to Sell Covisint at an Unfair Price Now Rather Than Pursuing Other Viable Strategic Alternatives to Maximize Shareholder Value.**

110.    The unfair Merger and inadequate Merger Consideration were the result of a sales process that was commenced because of pressure from the Company's activist hedge fund investors to sell the Company now rather than pursue available alternatives to increase profitability and maximize shareholder value.  While one of the Company's larger shareholders (Dialectic) and two of its selected directors (Messrs. Mai and Yaron) ultimately realized that a sale of the Company for $2.45 per share was grossly unfair and not in the best interest of the Company's shareholders, by the time they voiced their position, it was too late; the rest of the Board members (Messrs. Inman, Smith, Goldsmith, Grabe, and Hansen) were committed to going through with the Merger, despite blatant indications that the Merger Consideration was "completely inadequate."  Messrs. Mai and Yaron ultimately gave into the will of the other five directors and Management and voted to approve the Merger, despite knowing it was unfair to the Company's shareholders.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

111. Beginning in May 2016, activist hedge fund investors, who owned significant amounts of Covisint stock, began criticizing the performance of the Covisint Board and Management with letters and phone calls.

112. On May 18, 2016, Roumell Asset Management ("Roumell") sent a letter to the Board urging them to sell the Company and advocating for a change of at least two of the Board members.

113. On May 21, 2016, Vector Capital ("Vector") sent a letter to the Board pressing them to sell the Company. Vector indicated that it had unique access to Covisint management, writing that it had "engaged extensively with management" since the Company's IPO in 2013. Recognizing Covisint's strong growth prospects and the fact that the market had not properly valued the Company, Vector also stated that it would like to pursue a take private transaction with the Company.

114. On May 24, 2016, the Board held a meeting with members of the senior management of the Company. Mr. Inman advised the Board regarding the letters received from Roumell and Vector. In particular, the Board discussed Vector's request that the Company delay the due date for the submission of proposals to be included in the Company's annual proxy statement. The Board members ultimately determined not to delay such due date, as they were eager to do everything in their power to prevent challenges to their directorships.

115. On June 2, 2016, Dialectic sent a letter to the Board outlining its plan for a complete overhaul of directors. Dialectic stated that the Board had negotiated with them in bad faith, and therefore they would nominate five new director candidates for election to replace the existing Board at the 2016 Annual Meeting. Dialectic also accused the Defendants on the Board at the time of delaying their responses to Dialectic and pushing back the Company's first quarter earnings call

until *after the nomination deadline* for the 2016 Annual Meeting, thereby making it more difficult and expensive for shareholders to nominate new individuals for directorships.

116.    On June 6, 2016, Messrs. Inman and Digirolamo held telephone conversations with the Company's top shareholders, which presumably included the activist hedge funds. Many shareholders indicated their displeasure with the Company's and thus the Board's and Management's performance, as well as the delayed earnings release.  Those shareholders also indicated that the Company should consider strategic alternatives, such as a sale of the Company.

117.    On June 14, 2016, Dialectic sent another letter to the Board reaffirming its resolve for action. Citing the Board's failure to cooperate with shareholders, Dialectic alleged that leadership was profiting from excessive compensation, and restated its intent to overthrow the Board at the 2016 annual meeting. Dialectic wrote that it "strongly believe[d] the Company's strategic plan need[ed] to be reviewed by a fresh set of eyes given the apparent lack of appropriate oversight by the existing Board." Dialectic indicated that it was open to pursuing all possible avenues for Company growth.

118.    On June 15, 2016, Roumell sent a second letter to the Board. Roumell again pressured the Board to sell the Company, and offered them a compromise. They suggested that the Board should focus on the sale of the Company instead of a potential proxy fight. To incentivize Board acquiescence, Roumell suggested appointing two new independent directors instead of replacing five of the current directors. Roumell ended the letter with an intimidating warning that the "current" Board "should not thwart the will of multiple large shareholders."

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

119.    In a subsequent interview with Crain's Detroit Business, a representative of Roumell stated "*[t]here's no question that in a proxy fight, this board will not only lose, but lose badly.*"[9]

120.    Thus, by June of 2016, the hedge fund investors had sent a resoundingly clear message to the Board– they could either sell the Company, or face the embarrassment and stigma of losing their jobs for poor performance.

121.    The Board at the time and Management ultimately reached out to Dialectic and began negotiating the terms of a cooperation agreement. On August 25, 2016, the Board entered into the Cooperation Agreement with Dialect, pursuant to which the Company agreed to appoint Messrs. Andreas Mai, John F. Smith, and Jonathan Yaron, to the Board.  In exchange, Dialectic agreed to, among other things, certain standstill provisions and termination of its proxy contest.

122.    Concurrently with the announcement of the appointment of these three directors, Covisint also announced that former directors Homaira Akbari and Philip Lay would be leaving the Board. The four incumbent directors, Messrs. Inman, Goldsmith, Grabe, and Hansen, were able to salvage their directorships, and avoided the embarrassment of losing their jobs in a proxy contest launched by a shareholder accusing them of poor performance and a lack of oversight.

123.    After receiving the initial three letters, on June 3, 2016, the Board immediately agreed to formally engage Evercore as its financial advisor. After agreeing to the Cooperation Agreement and instating the Dialectic Directors in late August, the new Board ramped up the intensity of the sales process. In less than two months, the Company went from hearing offers to engaging in a formal but fundamentally flawed sales process that favored OpenText. *Supra*. The

---

[9] Tom Henderson, *Investor vows to win proxy fight with Covisint*, Crain's Detroit Business, June 24, 2016, http://www.crainsdetroit.com/article/20160624/NEWS/160629819/investor-vows-to-win-proxy-fight-with-covisint.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

Company started entering into confidentiality agreements and performing reactionary valuation analyses.

124. However, by late March of 2017, two of the directors appointed by Dialectic, Messrs. Mai and Yaron, recognized that the sales process had not resulted in a fair offer price, and that the Company had other alternatives to increase profitability. All the Defendants, via multiple statements by Messrs. Mai and Yaron, were made aware that offers of $2.50 or less were unreasonably low. Defendants were also aware that there was absolutely no need to sell the Company at the present time, as there were multiple viable strategic alternatives to increase shareholder value, including reducing expenses as part of a broader restructuring strategy and pursuing a course of action for the business similar to the Sensitized Projections.

125. Unfortunately for Covisint shareholders, by the time Messrs. Mai and Yaron voiced their position, the rest of the Board and Management had become committed to finalizing a merger with OpenText as soon as possible. The hold-over directors and officers, Messrs. Inman, Goldsmith, Grabe, Hansen and Digirolamo, were eager to wrap up a deal now rather than face another year of pressure and criticism from Dialectic. Approving a transaction now allowed these Defendants to gracefully leave their positions with the Company (rather than being removed in a proxy contest or fired) and obtain personal financial benefits, including severance payments and the accelerated vesting of restricted stock units and options. As the Proxy notes, the interests of the Company's directors and executive officers were not aligned with the Company's shareholders because the Merger Agreement provided for acceleration of the vesting and settlement of certain Company options and restricted stock units[10], and because the Company's executive officers were

---

[10] In August 2009, Covisint established a 2009 Long-Term Incentive Plan ("2009 Covisint LTIP") allowing the Board of Directors of Covisint to grant stock options, stock appreciation rights, restricted stock, restricted stock units ("RSUs"), performance-based cash or RSU awards and

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

parties to severance agreements that provided for severance benefits payable in the event of a termination as a result of the Merger.

126.    Further, Defendants recognized that other large activist investors, including Vector, supported finalizing a merger now rather than pursuing other strategic alternatives and revisiting a sale of the Company a year or two down the road.  Vector's desire for a quick sale was well known, as it routinely invests in undervalued companies and pushes for quick sales, and it had a particular need for quick cash as a result of other significant investments it recently made.  This caused Vector's interests and desires to ultimately diverge from Dialectic's; unlike Vector, Dialectic was willing to allow the Company to pursue alternative paths to maximize shareholder value rather than selling now, but it would have kept up pressure on Management and the Board to execute. In breach of their fiduciary duties, and in bad faith, the Defendants ultimately decided that selling the Company now was easier, less stressful, and personally preferable to them rather than having to execute the alternative paths to profitability while under pressure from Dialectic.

127.    Defendant Goldsmith, who is a general partner of another private equity firm, understood the needs and desires of Vector.  As an article on investor news service website *Seeking Alpha* states: "He is a general partner of another private equity firm. He will understand the needs of Vector Capital and may convince other directors to sell the business."[11]

---

annual cash incentive awards to employees and directors of Covisint and its affiliates. The 2009 Covisint LTIP reserved 7.5 million common shares of Covisint for issuance under this plan. As of December 31, 2016, there were 2.6 million stock options and 1.0 million RSUs outstanding under the 2009 Covisint LTIP.

[11] *Covisint Will Probably Be Bought Out: A Lot Of Institutional Investors Are Waiting For It*, SEEKING ALPHA (Jun. 6, 2016), https://seekingalpha.com/article/3980084-covisint-will-probably-bought-lot-institutional-investors-waiting.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

128.     Unlike common shareholders who are interested in maximizing their investment in Covisint over the long-term by pursuing only the best possible strategic transaction for the Company, regardless of the form of compensation, structure or timing, hedge funds like Vector that wish to remain in business must successfully raise funds, invest them in portfolio companies, then exit the companies and return the cash proceeds to fund investors, who in turn are expected to reinvest in a new fund formed by the same firm.  The timing and form of an exit are critical to hedge funds. The aim of a hedge fund is to provide an investment return as quickly as possible. To achieve this goal, hedge funds seek to earn profits quickly on one investment and then shift funds into another investment that is more immediately promising. Simply put, the focus of hedge funds is on short-term profits. As Delaware Supreme Court Chief Justice Leo E. Strine recently explained, activist investing is an inherently short-term game, and the game plan is always the same: buy into a company, agitate for a sale, watch as the company's stock price increases on the hope of a sale, force a sale, and cash out. Leo E. Strine, Jr., *Who Bleeds When the Wolves Bite?: A Flesh-and-Blood Perspective on Hedge Fund Activism and Our Strange Corporate Governance System,* 126 YALE L.J. 1870, 1871 (2017).

129.     Hedge funds like Vector are typically closed-end funds that operate for a limited term. They start by raising money from investors and generally spend one to a few years investing in a portfolio of companies, which is known as the "investment period." The next chapter is known as the "harvesting period," which is when funds reap the rewards of their investments. Ultimately, harvesting means selling the fund's stakes in companies and liquidating the fund.

130.     One form of common exit for hedge funds are a liquidation via a sale to a larger company. Hedge funds like Vector are willing to liquidate their shares even in strong and viable companies because of their limited resources and the need to manage other portfolio firms. Hedge

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

funds like Vector also seek to avoid situations in which an entity is profitable, but requires ongoing monitoring and where growth opportunities and prospects for exit are not high enough to generate an attractive enough internal rate of return. Such companies are routinely liquidated via sales to larger companies for cash, allowing hedge funds to quickly exit on their investment and turn their efforts and attention to new ventures.

131.    During the harvesting period, hedge funds like Vector prefer all cash merger transactions rather than alternatively structured transactions, such as licensing ventures or selling a company in pieces. All-cash mergers are preferred because they allow hedge funds to return more money to their investors or reinvest in new companies quickly. Conversely, alternative transactions fail to provide hedge funds with the instant liquidity they desire.

132.    Here, the activist hedge funds/private equity firms that pressured the Board to sell the Company, Vector and Roumell, as well as Elliott Associates, LP ("Elliott")[12] and J. Goldman & Co. L.P., are well known for pushing for the sale of companies they invest in.

133.    Vector is an activist investor particularly well known for purchasing large ownership stakes in small technology firms, and forcing their sale to larger corporations. In 2007, Vector took on a new round of financing from investors. Five years later, they began receiving complaints from investors about returns.[13] Soon after, they cashed-out their positions in the small technology firm Acutate Corp. through an all-cash merger transaction with OpenText.

---

[12] Elliott owned 7.2% of Covisint's outstanding stock. Additionally, Elliot initiated a proxy contest and was the driving force to take BMC Software, Inc. private back in 2013. This is relevant because OpenText's chairman of the board, Tom Jenkins, is, and was, also a board member of BMC Software.

[13] See Sean Silcoff, *Open Text's $330-million acquisition a win for private equity*, THE GLOBE AND MAIL, Dec. 5, 2014, https://www.theglobeandmail.com/report-on-business/streetwise/open-texts-330-million-acquisition-a-win-for-private-equity/article21970394/ (explaining that Vector "was set up with the goal of investing in under-valued tech companies. In 2007, it raised $1.2-billion

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

134.    More recently, in August 2016, Vector executed a $122.6 million cash acquisition of Sizmek Inc. The transaction involved no financing, and was paid in cash in immediately available funds. After this significant outlay of cash, it is no surprise that Vector sought to promptly liquidate its position in a small technology company (Covisint), and was unwilling to pursue strategic alternatives that would have taken another year or two to execute on. And just like the Acutate deal, OpenText once again emerged as the preferred suitor, jumping in and acquiring the Company in an all-cash transaction.

135.    In sum, Defendants, acting in bad faith, orchestrated a flawed sales process for the benefit of a few activist hedge fund investors and themselves. In doing so, they intentionally breached their fiduciary duties to Covisint shareholders and harmed shareholders significantly. The thought of needing to execute on other alternatives to profitability under pressure from Dialectic and the potential of being fired or dismissed from their lofty boardroom seats motivated Defendants to abdicate their fiduciary obligations to *all* Covisint shareholders. In breach of their fiduciary duties, Defendants agreed to sell the Company for the unfair Merger Consideration, despite repeatedly recognizing that the Merger Consideration was grossly inadequate and that there was absolutely no need to sell the Company, as there were multiple other viable strategic alternatives to increase shareholder value.

**D.    Defendants Acted in Self Interest and Received Personal Financial Benefits as a Result of the Merger.**

136.    On August 25, 2016, the same day that the new Dialectic-affiliated directors joined the Board and it became clear that a sale of the Company was going to be pushed for, the Company entered into a severance agreement with Mr. Digirolamo valued at over a $1 million. Pursuant to

---

from investors including Harvard University. Five years later, investors were reportedly disappointed the company had not put more of that money to work…")

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

the severance agreement, if Digirolamo's employment is terminated within one year following a change in control (such as the Merger), he is entitled to receive (i) a lump sum severance payment, in cash equal to the sum of his base salary and his target annual bonus under any annual bonus or incentive plan applicable to him; (ii) reimbursement for 12 months of COBRA continuation coverage; (iii) a cash payment in an amount equal to any unpaid incentive compensation which has been allocated or awarded to him for any year prior to the year of termination and which is contingent only on his continued employment; and (iv) full vesting of any outstanding stock options. Mr. Digirolamo's severance agreement also provides that if payments and benefits provided to Mr. Digirolamo would constitute an "excess parachute payment" for purposes of Section 280G of the Code, he will either have his payments and benefits reduced to the highest amount that could be paid without triggering Section 280G or receive the after-tax amount of his payment and benefits, whichever results in the greater after-tax benefit to Mr. Digirolamo, taking into account the excise tax imposed under Section 4999 of the Code and any applicable federal, state and local taxes.

137. A month later, the Company entered into a severance agreement with Mr. Asam valued at over $850,000. Pursuant to the severance agreement, if Asam's employment is terminated within one year following a change in control, he is entitled to receive: (i) a lump sum severance payment, in cash equal to the sum of his base salary and his target annual bonus under any annual bonus or incentive plan applicable to him; (ii) reimbursement for 12 months of COBRA continuation coverage; (iii) a cash payment in an amount equal to any unpaid incentive compensation which has been allocated or awarded to him for any year prior to the year of termination and which is contingent only on his continued employment; and (iv) full vesting of any outstanding stock options. Mr. Asam's severance agreement also provides that if payments

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

and benefits provided to Mr. Asam would constitute an "excess parachute payment" for purposes of Section 280G of the Code, he will either have his payments and benefits reduced to the highest amount that could be paid without triggering Section 280G or receive the after-tax amount of his payment and benefits, whichever results in the greater after-tax benefit to Mr. Asam, taking into account the excise tax imposed under Section 4999 of the Code and any applicable federal, state and local taxes.

138.   This deliberate and instantaneous response to the appointment of the Dialectic Directors clearly indicates the Board's intentions at this juncture. After kowtowing to the will of the hedge funds, and preserving their own positions, the Board and Management moved immediately to enhance executive compensation. This is a clear deviation from their fiduciary duties owed to the shareholders. Instead of focusing on maximizing shareholder value, the Board acted to fortify and enhance their colleagues' personal financial interests. The urgency in which these severance agreements were consummated highlights what was most important to Management, their own financial well-being.

139.   As a result of the severance agreements the Company entered into with Messrs. Inman, Digirolamo, and Asam, each of them stands to receive significant change in control payments, in the form of cash and equity, as set forth in the below table:

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

**Quantification of Change in Control Payments**

| Name | Cash ($)(1) | Equity ($)(2) | Perquisites/ Benefits ($)(3) | Tax Reimbursement ($) | Total ($)(4) |
|---|---|---|---|---|---|
| Samuel M. Inman, III | 1,120,003 | 490,000 | 21,180 | — | 1,631,183 |
| Enrico Digirolamo | 1,025,000 | 37,125 | — | — | 1,062,125 |
| Steven R. Asam | 560,000 | 284,600 | 21,180 | — | 865,780 |

(1) As described in the section of this proxy statement entitled *"The Merger (Proposal 1)—Interests of the Company's Directors and Executive Officers in the Merger—Existing Severance Agreements with Samuel M. Inman, III, Enrico Digirolamo and Steven R. Asam,"* the amounts reported are based on one year of base salary and one year of target bonus for each executive officer. The amount reported for Mr. Inman also includes a pro-rata bonus equal to one year of base salary, which has been calculated assuming he is subject to a qualifying termination as of July 31, 2017. The amount reported for Mr. Digirolamo also includes a retention bonus payable in two installments.

(2) As described in the section of this proxy statement entitled *"The Merger (Proposal 1)—Interests of the Company's Directors and Executive Officers in the Merger—Existing Severance Agreements with Samuel M. Inman, III, Enrico Digirolamo and Steven R. Asam,"* one hundred percent of the executive officer's outstanding equity awards will vest upon a qualifying termination. The amounts reported set forth the in-the-money value for unvested options and the value of the shares subject to unvested restricted stock units. The value of the acceleration of the Company's options is calculated by multiplying the number of shares subject to accelerated company options with an exercise price less than $2.45 by the difference between $2.45 and the exercise price. The value of the Company's restricted stock units is based on the number of outstanding restricted stock units, multiplied by $2.45.

(3) As described in the section of this proxy statement entitled *"The Merger (Proposal 1)—Interests of the Company's Directors and Executive Officers in the Merger—Existing Severance Agreements with Samuel M. Inman, III, Enrico Digirolamo and Steven R. Asam,"* these amounts equal the value of reimbursement for COBRA coverage for 12 months following a qualifying termination for Mr. Inman or if Mr. Asam's employment is terminated within one year following a change in control (either by the Company without cause or by Mr. Asam for good reason).

(4) The amounts reported are subject to reduction in the event the executive officer would be better off on an after-tax basis being cut back than paying the excise tax under Section 4999 of the Code.

140.     As a result of the Merger, Covisint's remaining directors also received personal financial benefits for currently unvested stock options and restricted stock units, which, upon completion of the Merger, fully vested and became exercisable.

141.     In sum, Defendants breached their fiduciary duties when they engaged in negotiations that benefitted themselves and placed their personal interests ahead of the interests of Covisint's common shareholders. Defendants focused on preserving their reputations and securing post-close executive compensation and post-close stock vesting instead of maximizing shareholder value.

**E.     Defendants Acted in Bad Faith and Breached Their Fiduciary Duty to Maximize Shareholder Value by Including "Standstill" and "Don't Ask, Don't Waive" Provisions in the Confidentiality Agreements With Interested Potential Buyers.**

142.     Defendants further breached their fiduciary duties and acted in bad faith by intentionally impeding interested potential buyers from taking actions to offer Covisint shareholders a better deal. Specifically, Defendants included restrictive "standstill" and "don't ask,

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

don't waive" provisions in the confidentiality agreements the Company entered into with 16 companies that were interested in acquiring Covisint, 12 of which remained in place and effect as of the shareholder vote on the Merger.

143.     A potential acquirer that is bound by a "standstill" is obligated to refrain from various actions that relate to acquisition of control of the target company, such as making proposals to acquire the target, buying shares, and launching a proxy contest. And a "don't ask, don't waive" provision in a standstill prohibits a potential acquirer from making any public or private request that a target waive the standstill restrictions.  By including these provisions in the confidentiality agreements the Company entered into with 16 interested bidders, and allowing 12 to remain in place and binding, the Defendants prevented these interested bidders from taking actions to offer Covisint shareholders a better deal.

144.     These restrictive terms in the confidentiality agreements the Company entered into with interested acquirers are yet another indication that the Defendants did not care about maximizing value for all Covisint shareholders. Defendants breached their fiduciary duty to maximize shareholder value and acted in bad faith by including these provisions in the Company's confidentiality agreements.

**F.     The Board Breached its Duty of Candor by Disseminating the Materially Incomplete and Misleading Proxy Statement.**

145.     The Defendants further breached their fiduciary duties to Covisint's former shareholders by causing the materially incomplete and misleading Proxy Statement to be mailed to shareholders on or about June 26, 2017.  As discussed below, the Proxy Statement omitted material information that was necessary to enable Covisint's shareholders to cast an informed vote with respect to the Merger.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

146.    First, the Proxy Statement failed to disclose material iterations of Covisint's financial projections, including: (i) the Company's Base Case projections that were utilized by Evercore in August 2016; (ii) the Company's Base Case and Sensitized projections prepared in March 2017[14]; and (iii) the unlevered free cash flow projections[15] for both the Sensitized and Base Case scenarios.

147.    The pre-May 2017 iterations of the Company's projections were material to Covisint shareholders, as they were necessary for shareholders to assess the legitimacy of the May 2017 projections that Defendants included in the Proxy Statement, which were revised multiple times from earlier iterations of the Company's projections and likely altered to enable Evercore to render its so-called "fairness opinion." Indeed, as Dialectic noted, Evercore's valuations "seem illogical and manufactured to yield the desired outcome of a sale."[16]

148.    Further, the unlevered cash flows were utilized by Evercore in its discounted cash flow valuation, and were material to the Company's shareholders. Indeed, investors are concerned, perhaps above all else, with the unlevered free cash flows of the companies in which they invest. Under sound corporate finance theory, the value of stock should be premised on the expected unlevered free cash flows of the corporation. Without unlevered free cash flow projections, the Company's shareholders were unable fully and fairly assess the Company's value.

---

[14] These projections were prepared by Management only after, and apparently in response to, the offers made by Companies B, D, I, and M.

[15] Unlevered free cash flows are used to determine a company's enterprise value. The unlevered free cash flow allows investors to ascertain the operating value of a company independent of its capital structure. This provides a greater degree of analytical flexibility and allows for a clearer picture of the value of the company overall. For this reason, unlevered free cash flows are routinely used to value a company, especially in merger contexts.

[16] Dialectic Letter, *supra* note 1.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

149.    The omission of the above-referenced projections rendered the financial projections included in the Proxy Statement materially incomplete and misleading. If a Proxy Statement discloses financial projections and valuation information, such projections must be complete and accurate.

150.    Additionally, The Proxy Statement failed to disclose certain material valuation analyses Evercore prepared for the Board. First, on October 24, 2016, the Board instructed Evercore to prepare an analysis of the potential valuations the Company could receive if it was profitable.  Second, Evercore presented a sum of the parts valuation analysis to the Board on November 21, 2016. This analysis was made in regard to the possibility of selling off parts of the Company to different buyers, and comparing that value against selling the Company as a whole. Third, on March 27, 2017, Evercore led the Board through a standalone valuation of the Company based on the March 2017 Base Case Projections and Sensitized Projections, which caused Messrs. Mai and Yaron to indicate that they did not favor a sale of the Company in the $2.50 range. However, none of these valuation analyses were disclosed in the Proxy Statement. Such analyses would have been material to the Company's shareholders because they were necessary to fully and fairly understand the Company's value and determine whether the Board should have pursued an alternative transaction or continued as a going concern.

151.    Further, while the Proxy Statement provided projections for non-GAAP (generally accepted accounting principles) metrics, including EBITDA, it failed to provide line item projections for the metrics used to calculate these non-GAAP measures or otherwise reconcile the non-GAAP projections to the most comparable GAAP measures.

152.    When a company discloses non-GAAP financial measures in a Proxy Statement, the Company must also disclose all projections and information necessary to make the non-GAAP

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

measures not misleading, and must provide a reconciliation (by schedule or other clearly understandable method), of the differences between the non-GAAP financial measure disclosed or released with the most comparable financial measure or measures calculated and presented in accordance with GAAP.

153.   The disclosure of non-GAAP metrics without a reconciliation to the most directly comparable GAAP measure is inherently misleading, as non-GAAP measures lack consistent definitions and can be altered to make a company look more or less attractive depending on the circumstances. For this reason, non-GAAP measures have been referred to as "fantasy math."[17]

154.   In order to make the projections included on pages 48-49 of the Proxy Statement materially complete and not misleading, Defendants were required to provide a reconciliation table of the non-GAAP measures to the most comparable GAAP measures, but they failed to do so.  As a result, Covisint shareholders were unable to properly value the Company.

155.   At the very least, the Company was required to disclose the line item projections for the financial metrics that were used to calculate the non-GAAP measures, including EBITDA (*i.e.*, earnings before interest, taxes, depreciation and amortization, which the Company calculates as revenue, minus total operating costs and expenses, plus depreciation and amortization).  Such projections were necessary to make the non-GAAP projections included in the Proxy Statement not misleading.  Indeed, the Defendants acknowledged that disclosing non-GAAP projections may mislead shareholders in the Proxy Statement: "Non-GAAP financial measures should not be considered in isolation from, or as a substitute for, financial information presented in compliance

---

[17] *See* Gretchen Morgenson, *Fantasy Math Is Helping Companies Spin Losses Into Profits*, N.Y. TIMES, April 22, 2016.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

with GAAP, and Non-GAAP financial measures as used by the Company may not be comparable to similarly titled amounts used by other companies." Proxy Statement 48.

156.    Covisint could have made these reconciliations without unreasonable effort; indeed, the Company regularly prepared non-GAAP reconciliations in both their press releases and their earnings reports. In fact, the Company performed line item GAAP reconciliations for historical EBITDA in the Proxy Statement:

### Reconciliation: GAAP Net Income to Non-GAAP EBITDA

| | FY2016 | FY2017 |
|---|---|---|
| GAAP Net Loss Per 10-K Filings | (14,894) | (12,726) |
| Capitalized Internal Software | (4,238) | (2,819) |
| Amortization of Capitalized Software | 3,398 | 4,274 |
| Stock Compensation Expense | 2,817 | 1,899 |
| Non-GAAP Net Loss per Earnings Call | (12,917) | (9,372) |
| Depreciation | 3,374 | 2,936 |
| Non-GAAP EBITDA per Proxy | (9,543) | (6,436) |

157.    With respect to Evercore's Discounted Cash Flow Analysis, the Proxy Statement failed to disclose the following key components used in the analysis: (i) the inputs and assumptions underlying the calculation of the discount rate range of 13.0% to 15.0%; (ii) the Company's projected net cash; (iii) the inputs and assumptions underlying the calculation of the Base Case "perpetuity growth methodology" perpetuity growth rate range of 2.0% to 5.0%; (iv) the inputs and assumptions underlying the calculation of the Base Case "terminal value multiple methodology" perpetuity growth rates of 6.0% and 6.3%; (v) the inputs and assumptions underlying the calculation of the Sensitized "perpetuity growth methodology" perpetuity growth rate range of -5.0% to -3.0%; and (vi) the inputs and assumptions underlying the calculation of the Sensitized "terminal value multiple methodology" perpetuity growth rates of -10.5% and -1.0%.

158.    These key inputs were material to Covisint shareholders, and their omission rendered the summary of Evercore's Discounted Cash Flow Analysis on pages 53-55 of the Proxy

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

Statement incomplete and misleading.  As a highly-respected professor explained in one of the

most thorough law review articles regarding the fundamental flaws with the valuation analyses

bankers perform in support of fairness opinions, in a discounted cash flow analysis a banker takes

management's forecasts, and then makes several key choices "each of which can significantly

affect the final valuation."  Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576

(2006).  Such choices include "the appropriate discount rate, and the terminal value…" *Id*.  As

Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any
> change can markedly affect the discounted cash flow value. For
> example, a change in the discount rate by one percent on a stream of
> cash flows in the billions of dollars can change the discounted cash
> flow value by tens if not hundreds of millions of dollars.…This issue
> arises not only with a discounted cash flow analysis, but with each
> of the other valuation techniques.  This dazzling variability makes it
> difficult to rely, compare, or analyze the valuations underlying a
> fairness opinion <u>unless full disclosure is made of the various inputs
> in the valuation process, the weight assigned for each, and the
> rationale underlying these choices</u>. The substantial discretion and
> lack of guidelines and standards also makes the process vulnerable
> to manipulation to arrive at the "right" answer for fairness.  This
> raises a further dilemma in light of the conflicted nature of the
> investment banks who often provide these opinions.

*Id.* at 1577-78.

159.    With respect to Evercore's *Peer Group Trading Multiples* and *Precedent Mergers*

Analyses (Proxy Statement 55-57), the Proxy Statement failed to disclose the individual multiples

Evercore calculated for each company and transaction utilized. The omission of these multiples

rendered the summary of these analyses and the implied per share equity value reference ranges

materially incomplete.  A fair summary of these analyses requires the disclosure of the individual

multiples for each company and transaction; merely providing the range that a banker applied is

insufficient, as the average shareholder is unable to assess whether the banker applied appropriate

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

multiples, or, instead, applied unreasonably low multiples in order to drive down the implied share price ranges.

160.     With respect to Evercore's Premiums Paid Analysis, the Proxy Statement failed to disclose the highest and lowest premiums Evercore observed in connection with its analysis, which was material information and was necessary for shareholders to properly assess the inadequacy of the premium they were offered.

161.     The Proxy Statement also failed to disclose whether any of the Defendants or other members of senior management retained their positions with the post-merger combined company. The press release announcing the Merger stated that certain Covisint team members would retain their jobs, but it is currently unclear whether this includes the Defendants. Such information was clearly material to Covisint shareholders.

162.     Lastly, while the Proxy Statement noted that Covisint entered into confidentiality agreements with numerous interested bidders, it failed to specifically identify which bidders had agreements containing "standstill" and/or "don't ask don't waive" provisions that remained in effect and thereby restricted such bidders from taking steps to make a superior proposal.  Covisint shareholders would have found such information material, as it related directly to the ability (or lack thereof) of parties that expressed serious interest in acquiring the Company to make a superior offer.  Indeed, Dialectic noted that a standstill provision prevented it from taking certain actions to advocate for a higher sale price.[18]

163.     In sum, Defendants breached their duty of candor to the Company's shareholders by omitting material information from the Proxy Statement and thereby depriving shareholders of their right to cast a fully informed vote on the Merger.

---

[18] Dialectic Letter, *supra* note 1.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

164.    While Dialectic was able to recognize the unfairness of the Merger, it is a sophisticated shareholder, and the Company's smaller common shareholders lack the same level of expertise in valuing companies and the resources to do so.  Further, the Dialectic Letter was issued only six days before the shareholder vote on the Merger and was not mailed directly to shareholders, and many shareholders therefore undoutbeldy were unaware of the Dialectic Letter when voting.  Defendants' duty of candor required them to provide shareholders with *all* material information, and to be partially or even mostly informed does not satisfy the requirement that shareholders be fully informed.

## CLASS ACTION ALLEGATIONS

165.    Plaintiffs bring this action on behalf of themselves and as a class action on behalf of all former holders of Covisint stock who were harmed by Defendants' actions described herein (the "Class").  Excluded from the Class are Defendants and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendants.

166.    This action is properly maintainable as a class action pursuant to MCR 3.501.  The Class is so numerous that joinder of all members is impracticable.  As of the record date, there were approximately 40.9 million shares of Covisint common stock outstanding, owned by numerous shareholders.

167.    There are questions of law and fact which are common to the Class and which predominate over any questions affecting only individual members, including *inter alia,* the following:

        a)    whether the Defendants breached their fiduciary duties owed to Plaintiffs and the Class;

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

b)        whether the Defendants engaged in a scheme to benefit themselves at the expense of Covisint shareholders in violation of their fiduciary duties;

c)        whether the Defendants acted in furtherance of their own self-interest to the detriment of the Class; and

d)        whether Plaintiffs and the other members of the Class have suffered damages as a result of the Defendants' alleged breaches of their fiduciary duties.

168.    Plaintiffs are committed to prosecuting this action and have retained competent counsel experienced in litigation of this nature.  Plaintiffs' claims are typical of the claims of the other members of the Class and Plaintiffs have the same interests as the other members of the Class.  Accordingly, Plaintiffs are adequate representatives of the Class and will fairly and adequately protect the interests of the Class.

169.    The maintenance of the action as a class action will be superior to other available methods of adjudication in promoting the convenient administration of justice.  In view of the complexity of the issues or the expense of litigation, the separate claims of individual Class members are insufficient in amount to support separate actions. Further, the prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

## COUNT I

### Claim for Breach of Fiduciary Duties Against All Defendants

170.    Plaintiffs incorporate by reference and realleges each and every allegation contained above, as though fully set forth herein.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

171.     As set forth above, Defendants violated their common law fiduciary duties owed to the former public shareholders of Covisint.  Defendants failed to maximize shareholder value, breached their duty of candor, and acted in bad faith and out of self-interest by: (i) pursuing and finalizing the Merger despite knowing it was not fair to the Company's shareholders and that the Company had better available paths to maximize shareholder value; (ii) favoring OpenText over other bidders and giving OpenText preferential treatment during the sales process; and (iii) agreeing to the Merger to advance their own personal financial interests, and placing their own interests ahead of the Company's shareholders.

172.     By the acts, transactions and courses of conduct alleged herein, the Defendants, individually and acting as a part of a common plan, unfairly deprived Plaintiffs and other members of the Class of the true value of their investment in Covisint.

173.     As demonstrated by the allegations above, the Defendants intentionally breached their duties of loyalty, good faith, care, candor, and to maximize shareholder value owed to the shareholders of Covisint.  The Defendants intentionally inflicted harm on Covisint shareholders by: intentionally failing to take reasonable steps to obtain and/or ensure that Covisint shareholders received adequate consideration for their shares (including conducting the fundamentally flawed sales process described above and declining to pursue better strategic alternatives to maximize shareholder value); agreeing to restrictive deal protection provisions in the Merger Agreement and requiring that interested bidders agree to "standstill" and "don't ask don't waive" provisions, which deterred other suitors from making a superior bid for the Company; placing their personal financial interests ahead of those of the Company's shareholders; and failing to disclose material information to the Company's shareholders in the incomplete and misleading Proxy Statement.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

174.    The Defendants dominated and controlled the business and corporate affairs of Covisint, and were in possession of private corporate information concerning Covisint's assets, business and future prospects.  Thus, there was an imbalance and disparity of knowledge and economic power between them and the public shareholders of Covisint which made it inherently unfair for them to benefit their own interests to the exclusion of maximizing shareholder value.

175.    By reason of the foregoing acts, practices and course of conduct, the Defendants have intentionally abdicated their fiduciary obligations toward Plaintiffs and the other members of the Class and inflicted harm upon said shareholders.

176.    As a result of the actions of the Defendants, Plaintiffs and the Class suffered damages, in that they have not and will not receive fair consideration for their shares, and have been and will be prevented from obtaining a fair price for their common stock, and were unable to make an adequately informed decision concerning whether or not to vote in favor of the Merger Agreement.

177.    Plaintiffs and the members of the Class seek damages for the Defendants' breaches of fiduciary duty in an amount to be determined at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand relief in their favor and in favor of the Class and against the Defendants as follows:

A.    Declaring that this action is properly maintainable as a class action and certifying Plaintiffs as Class representative and their counsel as Class counsel;

B.    Rescinding, to the extent already implemented, the Merger Agreement or any of the terms thereof, or awarding Plaintiff and the Class recissory damages;

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

C.      Awarding Plaintiffs and the Class damages incurred as a result of the Defendants' wrongdoing, including pre-judgement and post-judgement interest, in an amount to be determined at trial;

D.      Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

E.      Granting such other and further relief as this Court may deem just and proper.


**Respectfully Submitted,**


**MACWILLIAMS LAW PC**
/s/ Sara K. MacWilliams
Sara K. MacWilliams (P67805)
Local Counsel For Plaintiff
838 W. Long Lake Road, Suite 211
Bloomfield Hills, MI 48302
(248) 432-1586
sm@macwilliamslaw.com


and


**OF COUNSEL**

**MONTEVERDE & ASSOCIATES PC**
Juan E. Monteverde
Miles D. Schreiner
Counsel for Plaintiffs
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
Tel: (212) 971-1341
Fax: (212) 202-7880
jmonteverde@monteverdelaw.com
mschreiner@monteverdelaw.com

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

Dated: February 17, 2023

## **JURY DEMAND**

Plaintiff relies on the jury demand previously filed.

**MACWILLIAMS LAW PC**
/s/ Sara K. MacWilliams
Sara K. MacWilliams (P67805)
Local Counsel For Plaintiff
838 W. Long Lake Road, Suite 100
Bloomfield Hills, MI 48302
(248) 432-1586
sm@macwilliamslaw.com


and


**OF COUNSEL**

**MONTEVERDE & ASSOCIATES PC**
Juan E. Monteverde
Miles D. Schreiner
Lead Counsel for Plaintiff
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
Tel: (212) 971-1341
Fax: (212) 202-7880
jmonteverde@monteverdelaw.com
mschreiner@monteverdelaw.com


Dated: February 17, 2023

Document Submitted for Filing to MI Oakland County 6th Circuit Court.